UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ISRAEL P. BOND,**

    Petitioner,

v.                                             Case No. 8:14-cv-1469-MSS-UAM

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

    Respondent.
_____/

**O R D E R**

Bond petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court conviction for home invasion robbery. (Doc. 1) The Respondent asserts that the petition is time barred. (Doc. 6) Bond argues that the limitation period should equitably toll because post-conviction counsel abandoned him and that actual innocence excuses the time bar. (Docs. 2 and 27) After reviewing the petition, the response, the reply, the supplemental briefs, and the relevant state court record, the Court **DISMISSES** the petition as time barred.

**PROCEDURAL HISTORY**

A jury found Bond guilty of home invasion robbery with a weapon, and the trial court sentenced Bond to thirty years in prison. (Respondent's Exhibits 1 and 2) Bond appealed, and the state appellate court affirmed. (Respondent's Exhibit 3)

Bond moved for post-conviction relief (Respondent's Exhibits 8 and 10), the post-conviction court denied relief (Respondent's Exhibit 11), and the state appellate court affirmed. (Respondent's Exhibit 13) Also, Bond filed a petition alleging ineffective assistance

of appellate counsel (Respondent's Exhibit 15), and the state appellate court denied relief. (Respondent's Exhibit 16) Bond's federal petition followed.

In his federal petition, Bond asserts that the trial court violated his federal rights by denying his motion for a continuance (Ground One), trial counsel deficiently performed by not investigating his case and preparing for trial (Ground Two), trial counsel deficiently performed by not moving to suppress Bond's inculpatory statement to police (Ground Three), trial counsel deficiently performed by not impeaching a witness at trial with her deposition testimony (Ground Four), trial counsel deficiently performed by not investigating and arguing at trial an independent act defense (Ground Five), trial counsel deficiently performed by misadvising Bond not to testify at trial (Ground Six), trial counsel deficiently performed by not retaining a handwriting expert and moving to suppress a witness's identification of Bond (Ground Seven), and the prosecutor violated *Giglio v. United States*, 405 U.S. 150 (1972), by presenting false testimony at trial. (Ground Eight)

## ANALYSIS

Under 28 U.S.C. § 2244(d)(1), a one-year limitation applies to a Section 2254 petition and begins to run from the latest of:

> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

2

  (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

On March 12, 2010, the state appellate court affirmed Bond's conviction and sentence in a decision without a written opinion (Respondent's Exhibit 3), the state supreme court lacked jurisdiction to review the unelaborated decision, and Bond could have sought further review only in the United States Supreme Court. *Bates v. Sec'y, Fla. Dep't Corrs.*, 964 F.3d 1326, 1329 (11th Cir. 2020) (citing *Jackson v. State*, 926 So. 2d 1262, 1265 (Fla. 2006)). Bond did not seek further review in the United States Supreme Court, and the time to seek further review expired on June 10, 2010, ninety days after the state appellate court's decision. *Bates*, 964 F.3d at 1329. The next day, the limitation period for this petition started to run, and it expired on June 13, 2011. Fed. R. Civ. P. 6(a)(1)(A) and (a)(1)(C).

"[A] properly filed application for State post-conviction or other collateral review" tolls the limitation period. 28 U.S.C. § 2244(d)(2). On July 19, 2011, Bond placed in the hands of prison officials for mailing a petition for a writ of habeas corpus. (Respondent's Exhibit 4 at 23) On September 12, 2011, Bond placed in the hands of prison officials for mailing a motion for post-conviction relief. (Respondent's Exhibit 6 at 1) On December 12, 2011, Bond placed in the hands of prison officials for mailing a petition alleging ineffective assistance of appellate counsel. (Respondent's Exhibit 15 at 1) Because Bond sought post-conviction relief in state court after the limitation period expired, the filings did not toll the limitation period. *Sibley v. Culliver*, 377 F.3d 1196, 1204 (11th Cir. 2004) ("[O]nce a deadline has expired, there is nothing left to toll. A state court filing after the federal habeas filing deadline does not revive it."). On June 6, 2014, Bond placed in the hands of prison officials for mailing the Section 2254 petition. (Doc. 1 at 36) Consequently, his petition is untimely.

In Ground Four, Bond asserts that trial counsel deficiently performed by not impeaching Misty Dube, the victim, with her deposition testimony. (Doc. 1 at 15–19) In Ground Eight, Bond asserts that the prosecutor violated *Giglio v. United States*, 405 U.S. 150 (1972), by presenting false testimony by Dube, and contends that the deposition transcript demonstrates that her testimony was false. (Doc. 1 at 31–33) Bond contends that he "did not discover the deposition transcript until early 2010 after [trial counsel] responded to a Florida Bar complaint." (Doc. 9 at 10) Even if the limitation period for Ground Four and Ground Eight started under Section 2244(d)(1)(D) when Bond discovered the deposition transcript in early 2010, both grounds are untimely for the reasons explained above.

**Equitable Tolling**

Bond asserts that the limitation period should equitably toll because post-conviction counsel abandoned him (Doc. 2 at 2–4) (record citations omitted):

> Bond asserts that from the very beginning of this case he sought out the assistance of professional legal counsel. (See ground one facts). Even after the trial was over and he sought an appeal, Bond, through his mother Marie Willis, hired private counsel Simone Lennon, PA to represent him on direct appeal and in pursuing his postconviction rights. Ms. Lennon represented Bond on his direct appeal. After the *per curiam* affirmance was issued by the Second District Court, Bond's mother retained Ms. Lennon to further handle his 3.850 motion for post-conviction relief and then to file a federal petition if no relief was obtained in the state court. Ms. Lennon took a retainer on April 23, 2010, to begin the post-conviction process. During the next four to six months, Bond wrote Lennon to inquire about the progress of his case and about the time period to file a federal petition. Bond received no response from Lennon.
>
> In November 2010 Bond's mother inquired of Lennon as to the status of the motion and Lennon informed Ms. Willis that after her research she could find no legal basis for the motion in order to obtain relief for her son.

4

On December 3, 2010, [Lennon] wrote to Ms. Willis about her request for a refund of the monies they paid Lennon with an offer to refund some of the money, and wishing her and her son the very best, and apologized for not being able to file a legally supported motion on his behalf. Ms. Willis refused the partial refund; she wanted all the monies refunded.

Not having done any *pro se* legal research or filing before, Bond attempted to contact several attorneys to get a second opinion about his case. Bond received no response from any of the attorneys. In March 2011, Ms. Willis filed a bar complaint against Ms. Lennon which was pending until late summer 2011.

Once the bar complaint was filed, Bond resigned to the fact he could not get further professional help so he sought out the assistance of a jail house lawyer. Bond inquired about filing a federal petition because he had heard that there were time frames to follow. The jailhouse lawyer advised him there was case law to get around that, not to worry.

On July 15, 2011, Bond filed his first state post-conviction petition challenging his judgment and sentence in the Second District Court.

Bond asserts that he is entitled to equitable tolling from the time he hired Ms. Lennon until December 3, 2010, the time of her final correspondence that she was concluding her representation of Bond. The time should toll for her lack of communication and failure to research and discover the valid legal grounds which Bond through the assistance of prison lawyers were able to discover. Bond asserts this failure of Ms. Lennon created an extraordinary circumstance which stood in his way to timely file his federal petition.

Bond asserts that during the time Lennon represented him he was unable to research legal claims in which to challenge his conviction and sentence due to the fact Lennon had his only copy of his trial record and transcripts. When Bond became aware that Ms. Lennon's advice was incorrect, that there were no legal grounds to raise in a motion, he promptly filed a *pro se* petition, but the AEDPA time period had already expired by thirty-two days, thus establishing his entitlement to equitable tolling.

Bond asserts that he diligently pursued his rights by hiring Ms. Lennon to file a state habeas motion and then seeking what

> advice he could through jail house lawyers in prison. Bond did not wait years to do so, he sought out professional assistance immediately after the direct appeal was final, and as soon as he knew Ms. Lennon had basically abandoned him, he sought other attorney assistance to no avail. Once Bond began his *pro se* filings in state court he continued to diligently pursue his legal rights until the denial of his 3.850 motion was affirmed on appeal just a few days ago. At a minimum, this suggests Bond was diligent in trying to figure out how to proceed between the time he learned he would not receive a petition from Lennon and the time he ultimately filed.

Equitable tolling applies to a Section 2254 petition and requires the petitioner to demonstrate "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). "As an extraordinary remedy, equitable tolling is 'limited to rare and exceptional circumstances and typically applied sparingly.'" *Cole*, 768 F.3d at 1158 (citation omitted). "'The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence.'" *Cole*, 768 F.3d at 1158 (quoting *Holland*, 560 U.S. at 653). A petitioner must "show a causal connection between the alleged extraordinary circumstances and the late filing of the petition." *San Martin v. McNeil*, 633 F.3d 1257, 1267 (11th Cir. 2011). "*Pro se* litigants, like all others, are deemed to know of the one-year statute of limitations." *Outler v. United States*, 485 F.3d 1273, 1282 n.4 (11th Cir. 2000).

As explained above, the limitation period expired on June 11, 2011. A letter by Bond's mother dated November 26, 2010, demonstrates that over six months before the limitation period expired, post-conviction counsel returned Bond's case file to Bond's mother and advised that she would not draft a post-conviction motion for Bond (Doc. 15 at 18):

> Please recall April 23, 2010, I entrusted to you $750.00 (seven hundred fifty dollars) for the specific purpose of promulgating

6

> my son's rule 3.850 Fla. R. App. P. (2010) motion. The choice of medium was personal check, payable to you. Of course, within ninety-six hours you had endorsed that instrument for conversion. *See attached.*
>
> Recall further, subsequent the per curiam affirmance of my son's plenary appeal, for which you were paid in full by virtue of a separate personal check, and for which you raised a single claim under the "abuse of discretion standard," **you promptly returned my son's trial file and explicitly informed me that you would not promulgate my son's post-conviction motion, despite being prepaid.**
>
> Be advised, at this time, I request a full refund and no longer seek your advocacy in any manner. Accordingly, kindly comply with the specific demand within ten days, as I understand the monies entrusted to you for a specific purpose, including advance fees, are to be held in trust and shall be applied only for the intended purpose. Therefore, because the purpose of my $750.00 was to promulgate aforestated 3.850 motion, and you did not effectuate [the] same, rules regulating the Florida Bar dictate the return of my money is a matter of course. (emphasis added)

About a week later, on December 3, 2010, post-conviction counsel responded to the letter, offered to return part of the fee, confirmed that she advised both Bond and his mother that the post-conviction court would not likely grant relief, and she repeated that she would not file a post-conviction motion (Doc. 15 at 12) (italics in original):

> I write to respond to your letter dated November 26, 2010. I acknowledge receipt of $750.00 paid by you for research and investigation into a possible draft of a motion for post-conviction relief on Israel's behalf. I offer the following detailed account of work I put forth in researching and investigating potential issues for Israel's motion:
>
> | | |
> |---|---|
> | 2.5 hours | Researched all potential legal issues for motion using Westlaw |
> | 1.0 hour | Reading correspondences from Israel and drafting responses to Israel's letters regarding potential issues |

7

>    20 minutes    Phone conversation with Dwight Wells regarding potential issues for motion
> 
> It is implicit in an attorney's obligation to conduct research and gather facts before filing *any* legal document. At no time did I agree to perform these tasks without pay. As we have discussed at length, I determined after my research that we likely would not be granted relief on a post-conviction motion. As such, I advised you and Israel of my professional opinion.
> 
> Although I have earned all of the $750.00 paid to me, I have enclosed a check in the amount of $250.00 as a sincere effort to resolve this dispute. I still wish you and Israel the very best, and I am sorry that I could not file a legally supported motion on his behalf. Please take care, and my thoughts are still with you both.

On January 12, 2011, almost five months before the limitation period expired, Bond's mother filed the bar complaint and alleged that post-conviction counsel had failed to provide them written notice of the termination of representation and failed to take steps to protect their interests by providing them time to find new counsel. (Doc. 15 at 9) However, in her letter dated November 26, 2010, Bond's mother acknowledged that post-conviction counsel had "promptly returned [Bond's] trial file and explicitly informed [Bond's mother] that [post-conviction counsel] would not promulgate [Bond's] post-conviction motion, despite being prepaid." (Doc. 15 at 18)

Bond waited until September 12, 2011, three months after the federal limitation period expired, to file a *pro se* motion for post-conviction relief. (Respondent's Exhibit 6) When post-conviction counsel returned the trial file and advised that she would not file a post-conviction motion on behalf of Bond, ample time remained for Bond to either seek post-conviction relief on his own behalf or to retain another attorney to seek relief. Because Bond failed to diligently pursue his rights, the limitation period did not equitably toll. *Lugo v. Sec'y, Fla. Dep't Corrs.*, 750 F.3d 1198, 1209 (11th Cir. 2014) (holding that documents that a

petitioner filed after the limitation period expired did not demonstrate that the petitioner acted diligently to support equitable tolling); *Melson v. Comm'r, Ala. Dep't Corrs.*, 713 F.3d 1086, 1089 (11th Cir. 2013) ("While a petitioner is only required to exercise 'reasonable diligence,' not 'maximum feasible diligence,' Melson took no independent steps to ensure that his federal habeas petition was timely filed.") (quoting *Holland*, 560 U.S. at 653).

Also, Bond fails to demonstrate that post-conviction counsel's alleged abandonment "' . . . stood in his way' and prevented [him from] timely filing" a federal petition. *Holland*, 560 U.S. at 649. "[A]ttorney negligence, even gross or egregious negligence, does not by itself qualify as an 'extraordinary circumstance' for purposes of equitable tolling." *Cadet v. Fla. Dep't Corrs.*, 853 F.3d 1216, 1227 (11th Cir. 2017). "[E]ither abandonment of the attorney-client relationship . . . *or* some other professional misconduct *or* some other extraordinary circumstance is required." *Cadet*, 853 F.3d at 1227 (italics in original). The relevant inquiry is "whether [the petitioner] in addition to showing negligence 'has shown that his attorney[ ] . . . abandoned him, thereby supplying the extraordinary circumstances beyond his control' necessary to warrant equitable tolling." *Cadet*, 853 F.3d at 1228 (quoting *Maples v. Thomas*, 565 U.S. 266, 283 (2012)). "Abandonment denotes renunciation or withdrawal, or a rejection or desertion of one's responsibilities, a walking away from a relationship." *Cadet*, 853 F.3d at 1234.

Bond's post-conviction counsel did not abandon Bond. Bond, who is a non-capital petitioner, is not entitled to post-conviction counsel on federal habeas. 18 U.S.C. §§ 3006A(a)(2) and 3599(a)(2). Bond's mother instead retained post-conviction counsel, who reviewed the trial file and determined that she could not draft a facially sufficient motion. (Doc. 15 at 2) Post-conviction counsel did not desert her responsibilities as the

9

attorney for Bond, leaving him without recourse. Post-conviction counsel returned the trial file to Bond's mother and timely advised both Bond and his mother that she could not proceed. (Doc. 15 at 12, 18) When post-conviction counsel advised Bond and his mother of her withdrawal, ample time remained for Bond to retain new counsel or draft and file a *pro se* motion. R. Regulating Fla. Bar 4-1.16(b)(1) ("[A] lawyer may withdraw from representing a client if . . . withdrawal can be accomplished without material adverse effect on the interests of the client.").[1]

Because post-conviction counsel did not withdraw from representation without notifying Bond or without sufficient time for Bond to seek relief, his claim did not equitably toll. *Maples*, 565 U.S. at 914–15 ("A markedly different situation arises, however, when an attorney abandons his client without notice, and thereby occasions the default. In such cases, the principal-agent relationship is severed and the attorney's acts or omissions 'cannot fairly be attributed to [the client].'"). Lastly, because ample time remained for Bond to retain new counsel or draft and file a *pro se* motion after post-conviction counsel withdrew from representation, Bond fails to demonstrate "a causal connection between the alleged extraordinary circumstance[ ] and the late filing of the petition." *San Martin*, 633 F.3d at 1267.

---

[1] *See also* R. Regulating Fla. Bar 4-1.16(d), which explains how an attorney must protect a client's interests before withdrawing:

> Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interest, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled, and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers and other property relating to or belonging to the client to the extent permitted by law.

10

**Actual Innocence**

Bond asserts that actual innocence excuses the time bar. (Docs. 2 at 5–9 and 9 at 9–13) He alleges that, after the trial, he discovered a deposition transcript that proves that Misty Dube, the victim of the home invasion robbery, committed perjury when she testified at trial. (Doc. 2 at 7–8) Also, Bond contends that his own sworn statement proves his innocence. (Doc. 2 at 8–9)

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass . . . [the] expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin*, 569 U.S. at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). "To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

Bond submits as new reliable evidence a deposition transcript and his own sworn statement. Bond contends that he did not discover the deposition transcript until 2010 after he filed a bar complaint against trial counsel. (Doc. 9 at 10) He contends that trial counsel requested transcription of the deposition after trial, only when he had to respond to Bond's bar complaint. (Doc. 9 at 10) The deposition occurred on February 6, 2008 (Doc. 2-2), Bond's trial occurred on April 7, 2009 (Doc. 33-1 at 132), and the court reporter transcribed the

11

deposition on December 3, 2009. (Doc. 9 at 17) The evidence that Bond submits is summarized below.

### Testimony Concerning Money

At trial, Dube testified that Bond and his accomplice stole $300.00 that Dube kept in her bedroom:

| | | |
|---|---|---|
| [Prosecutor:] | | Let me ask you. Had you gone to the doctor recently? |
| [Dube:] | | I had. |
| [Prosecutor:] | | Okay. And did the doctor prescribe [ ] medication [for you]? |
| [Dube:] | | Yes. |
| [Prosecutor:] | | All right. Had you had an opportunity to fill all those prescriptions? |
| [Dube:] | | No, I wasn't able to. |
| [Prosecutor:] | | Why not? |
| [Dube:] | | Because I didn't have all the money together. |
| [Prosecutor:] | | At this time were you in the process of saving money? |
| [Dube:] | | Yes. |
| [Prosecutor:] | | Did you, in fact, have that money in your bedroom? |
| [Dube:] | | Yeah. I had about $300.00. |
| | | (Doc. 33-1 at 255) |
| [Prosecutor:] | | All right. Do you go into your bedroom and kind of look to see what's missing? |

| | |
|---|---|
| [Dube:] | I believe so. At that time my clothes were all wet. I was — peed on myself and I was shaking and I called the police. And I called another friend of mine, and then I called my daughter and told her to come home. I had been robbed. |
| [Prosecutor:] | Okay. Do you go into your bedroom and try to take inventory and kind of look and see maybe what's missing or what's not missing — |
| [Dube:] | Yeah. |
| [Prosecutor:] | — and tell the jury what was missing from your bedroom? |
| [Dube:] | It was my money and my prescription pills. |
| [Prosecutor:] | Okay. Tell the jury precisely what pills were missing. |
| [Dube:] | It was my Xanax, my Somas, and my Roxicodone. |
| [Prosecutor:] | Okay. These Somas that were missing, [were they] the same Somas that you gave to Erin the night before? |
| [Dube:] | Yes. |
| [Prosecutor:] | All right. Your money, where were you keeping your money at that time? |
| [Dube:] | It was in my pillow. |

(Doc. 33-1 at 268–69)

| | |
|---|---|
| [Prosecutor:] | Ms. Dube, how much money was missing from your house that night — that morning? Excuse me. I'm sorry. |
| [Dube:] | It was $300.00. |

(Doc. 33-1 at 273)

13

During the deposition, Dube testified that she did not keep money in her home when the home invasion robbery occurred (Doc. 2-2 at 14–15):

| | |
|---|---|
| [Trial counsel:] | Yeah. Now, he wanted money. Did you have any money? |
| [Dube:] | No. |
| [Trial counsel:] | So he didn't find any money? |
| [Dube:] | No. |

Bond contends that this prior inconsistent statement concerning the money is new evidence that proves his actual innocence.

### Testimony Concerning Dog

At trial, Dube testified that she did not own a dog at the time of the home invasion robbery (Doc. 33-1 at 283):

| | |
|---|---|
| [Trial counsel:] | Okay. And you didn't hear [your daughter] that morning get up and go to school, is that right? |
| [Dube:] | No, I did not. |
| [Trial counsel:] | Do you sleep with your door closed? |
| [Dube:] | No. |
| [Trial counsel:] | And would you hear your door open — would you hear the front door open and close as people leave? |
| [Dube:] | Sometimes. We have a dog. |
| [Trial counsel:] | I'm sorry. You have a dog? |
| [Dube:] | Yeah, we have a dog. |
| [Trial counsel:] | And does the dog — how does the dog react to your daughter? The dog knows your daughter, right? |

14

| | |
|---|---|
| [Dube:] | Wait. It was February? |
| [Trial counsel:] | Of [2007], yeah. |
| [Dube:] | We didn't have a dog at that time. |
| [Trial counsel:] | Okay. All right. |
| [Dube:] | Because he would have attacked the people. I got the dog after I had been attacked. |

During the deposition, Dube testified that she owned a dog (Doc. 2-2 at 21):

| | |
|---|---|
| [Prosecutor:] | Just so we're clear, did you allow them entry into the house or invite them to come into the home? |
| [Dube:] | No. |
| [Prosecutor:] | Did you want them to come into the home? |
| [Dube:] | No. I proceeded to — when they went to shove the door, I tried to shut it and they pushed it. And I also have a dog. The dog was barking hysterically. They kicked my dog. The dog ended up getting out, biting them. They proceeded kicking my dog. |
| [Prosecutor:] | What kind of dog? |
| [Dube:] | It's a miniature Jack Russell. |
| [Prosecutor:] | What's his name? |
| [Dube:] | Lucky. |

Bond contends that this deposition testimony concerning the dog is new reliable evidence that demonstrates his actual innocence. (Doc. 9 at 11)

### Bond's Sworn Statement

Lastly, Bond contends that he would have testified at trial as follows (Doc. 2 at 9):

15

>Bond would have testified that Erin Brennan called Ms. Dube that morning and told her we [were] coming to buy some pills. That Brennan told Dube she was just sending Bond to the door because she knew him from the night before. Bond would have testified that he told [his accomplice] when she lets them in that they were going to hang out on the couch for a minute. Bond was then going to ask to use the bathroom for a minute because it was by her bedroom where she kept her pills. Bond instructed [his accomplice] to keep her talking, and when he came out, he was going to pay her for the few pills she's got on her, and they'll leave real simple like. Bond would have testified that when he went to the bathroom and then snuck into her bedroom, she came to check on him and [his accomplice] grabbed a knife and forced her to the couch holding her down. Bond came out from the bedroom and yelled for him to let her go, told [his accomplice] he was tripping, and he let her go. Bond would have testified there was [no] forced entry because they knocked on the door, and Dube opened the door and let them in. Ms. Dube already knew they were coming because Ms. Brennan called her to let her know. Bond would also testify that after they left and got into the car he asked why [his accomplice] did what he did[;] [his accomplice] said, "Don't question what I did, just give me some of the pills you took" and he later sold them for crack. Bond desired to testify and face his jury knowing that he was only guilty of theft, not home invasion robbery.

To the extent that the deposition testimony would impeach Dube's testimony concerning the money and the dog, impeachment evidence is not the type of new reliable evidence that demonstrates actual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992) ("This sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of Shano's account of petitioner's actions.").

Also, a petitioner's own self-serving statement is not new evidence that demonstrates actual innocence. *Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004) ("A defendant's own late-proffered testimony is not 'new' because it was available at trial. Hubbard merely chose not to present it to the jury. That choice does not open the gateway.").

The jury found Bond guilty of home invasion robbery. (Doc. 33-1 at 61–62) "'Home-invasion robbery' means any robbery that occurs when the offender enters a dwelling with the intent to commit a robbery, and does commit a robbery of the occupants therein." § 812.135(1), Fla. Stat. "'Robbery' means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear." § 812.13(1), Fla. Stat.

The information alleged that Bond stole from Dube both "prescription medication" and "money." (Doc. 33-1 at 22) Even if the deposition testimony proves that Bond did not steal money from Dube, evidence at trial proved that Bond stole the medication. During an interrogation, Bond told the detective that he stole the medication. (Doc. 33-1 at 328) Also, in the sworn statement attached to his federal petition, Bond admits that he stole the medication. (Doc. 2 at 9) Consequently, the evidence proved that Bond committed a home invasion robbery even if he stole only the medication.[2]

Also, even if Dube's deposition testimony concerning the money and the dog contradicts Dube's testimony at trial, other evidence convincingly proved that Bond committed a home invasion robbery. *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004) ("The theory of admissibility is not that the prior statement is true and the in-court testimony is

---

[2] Before trial, trial counsel learned that Dube failed to inform a detective that Bond stole money from her and instead told the detective that Bond stole only medication from her. At trial, trial counsel impeached Dube with that omission. (Doc. 33-1 at 328–29, 387–88, 423–25)

17

false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements.").

During her deposition and at trial, Dube consistently testified that Bond and his accomplice shoved the front door open knocking her to the floor. (Docs. 2-2 at 21 and 33-1 at 261) Dube consistently testified that Bond demanded money and her medication. (Docs. 2-2 at 13 and 33-1 at 262) Dube consistently testified that both Bond and his accomplice wore surgical gloves and that Bond entered Dube's bedroom and stole her medication after his accomplice held her down while pointing a knife at her. (Docs. 2-2 at 13–15 and 33-1 at 264–68) A month after the robbery, Dube identified Bond in a photographic lineup prepared by the detective. (Docs. 2-2 at 19–20 and 33-1 at 272–73)

Also, at trial, the detective testified about statements that Bond made during an interrogation. (Doc. 33-1 at 324–28) In both his sworn statement submitted with his federal petition and during the interrogation, Bond admitted that he entered Dube's bedroom and stole her pills after his accomplice held Dube down and threatened her with a knife. (Docs. 2 at 9 and 33-1 at 326–28) Bond claimed that, on the day of the home invasion robbery, he entered Dube's home only with the intent to buy pills. (Docs. 2 at 9 and 33-1 at 325–26) However, if Bond testified at trial, the jury would have learned that Bond, who is a three-time convicted felon (Doc. 33-1 at 482–84), entered Dube's home wearing gloves and therefore would likely have rejected this self-serving statement. § 90.610(1), Fla. Stat.

"[C]onsider[ing] all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," Bond fails to demonstrate that "'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Rozzelle v.*

*Sec'y, Fla. Dep't Corrs.*, 672 F.3d 1000, 1017 (11th Cir. 2012) (quoting *House v. Bell*, 547 U.S. 518, 537–38 (2006)). Consequently, Bond's claim of actual innocence fails.

Accordingly, Bond's petition (Doc. 1) is **DISMISSED** as time barred. The Clerk is **DIRECTED** to enter a judgment against Bond and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Bond neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on August 1, 2024.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE